Argued April 22; affirmed October 22; petition for rehearing denied
November 16, 1948

## BOYCE *v.* KILLIP
198 P. (2d) 613

*L. E. Schmitt* and *F. C. Howell,* both of Portland,
argued the cause for appellants. With them on the
brief was G. B. McCluskey, of Toledo.

*Peter A. Schwabe,* of Portland, argued the cause for
respondents. On the brief were Haas & Schwabe, of
Portland.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and BRAND, Justices.

ROSSMAN, C. J.

This is an appeal by the plaintiffs from a decree of the circuit court, entered after trial, which dismissed their complaint. The plaintiffs-appellants are husband and wife; the defendants-respondents are likewise husband and wife. The purposes of the suit were (1) to reform two contracts; (2) to require the defendants to perform specifically the contracts as reformed; and (3) in the event specific performance was impractical to award the plaintiffs damages.

The assignments of error are:

"The court erred in finding that the evidence does not sustain plaintiffs' allegation of fraud and dismissing plaintiffs' second amended complaint."

"The court erred in refusing to reform and decree specific performance."

"The court erred in finding and holding that there was no tender made by the plaintiffs and appellants, and that the option in the lease had expired and was of no force and effect."

"The court erred in not decreeing that the defendants and respondents convey to the plaintiffs a water right sufficient for the purposes for which the land was used or in the event that the defendants could not perform, to assess plaintiffs' damages."

The aforementioned contracts pertain principally to two parcels of real property in Kernville, Lincoln County. Both parcels abutt upon the Siletz River and the Coast Highway. They are adjacent to each other and, although their size is immaterial to the issues before us, the one aggregated about one acre and the other about ten acres. The smaller was improved with cabins, a wharf and other facilities suitable for fishermen; it was operated as a fishing resort and was known as Happy Landing. The ten-acre tract was unimproved and much of it was flooded at high tide. Parts of it were used for the parking of automobiles.

One of the aforementioned contracts was signed by the plaintiffs and the defendants April 19, 1943. It is entitled Memorandum Agreement. The other contract was signed by the plaintiffs and the defendants June 14, 1943. It is entitled Lease. Both contracts pertain to the parcels of real property we have described, and both mention a "water right." The representations which were made by the defendants concerning the water right and the provisions in both papers pertaining to it are the parts of the transaction which are called in question by this suit. The plaintiffs contend that (1) the defendants made false representations concerning the water right and thereby induced the plaintiffs to sign both papers, and (2) neither of the papers correctly describes the water right which the defendants are required to transfer to the plaintiffs.

The plaintiffs do not seek to be relieved from either agreement. The prayer of the complaint asks that the defendants be ordered to transfer to the plaintiffs the water right which the complaint describes, or respond in damages.

The memorandum agreement which the parties

signed April 19, 1943, was preliminary in character and contemplated that it should be succeeded by other instruments. It bound (1) the plaintiffs to purchase the smaller tract (Happy Landing) for the sum of $5,500.00, payable $1,000.00 at the time of signing, $1,750.00 in sixty days, and $2,750.00 in monthly installments represented by a note secured by a mortgage; (2) the defendants to lease the larger tract to the plaintiffs for a term equal to the life of the mortgage at an annual rental of $100.00; (3) the defendants to grant the plaintiffs an option extending for the term of the lease to purchase the larger tract for the sum of $2,000.00; and (4) the defendants to convey to the plaintiffs "sellers' interest in water right known as Douty water right" if the plaintiffs exercised their option and purchased the larger tract.

The Memorandum Agreement reads as follows:

"This memorandum agreement made and entered into this 19th day of April, 1943, by and between J. J. Killip and Anna Louise Killip as the sellers, and Brewster I. Boyce and Sudie E. Boyce, his wife, as buyers.

"WITNESSETH:

"That the sellers agree to sell and the buyers agree to buy all of the improved portion of Siletz River water front property owned by them except that part occupied by warehouse, at and for the agreed sum of Five Thousand Five Hundred Dollars ($5,500.00) payable One Thousand Dollars ($1,000.00) upon the signing of this agreement, balance of Seventeen Hundred Fifty Dollars ($1,750.00) within 60 days and balance of Twenty-seven Hundred Fifty Dollars ($2,750.00) be represented by note and mortgage, payable One Hundred Dollars ($100.00) or more per month including interest at 6% per annum.

"That the buyers and sellers above named, agree that the unimproved portion of the Siletz River water front property owned by the sellers, be leased to the buyers at an annual rental of One Hundred Dollars ($100.00) per year. First year's rent to be paid upon the signing of this agreement, said lease to be in effect until mortgage on above described property is paid in full, at which time buyers have an option to purchase said unimproved portion of said property for Two Thousand Dollars ($2,000.00) and the rental paid under the lease applied upon the purchase price and if said option is not exercised, then the One Hundred Dollars ($100.00) rental shall be deemed and considered as rent. Balance of purchase price to be paid One Hundred Dollars ($100.00) per month with interest at 6% per annum.

"It is agreed between the parties hereto that if the option to purchase of unimproved portion of property is exercised, there shall be conveyed with said property sellers interest in water right known as Douty water right.

"Sellers reserve easement over right of way leading to warehouse property and agree with buyers that in case they sell the real property known as warehouse property and reserved by them, they will place a condition in the conveyance that said property be used for private purposes only and not be used by the public or in a way that will compete with business conducted by the owners on the property conveyed to buyers.

"It is mutually agreed that definite description of the property above referred to will be provided as soon as the necessary surveying can be done and at that time contract and lease with option will be prepared and executed in accordance with the terms of this memorandum.

"It is understood that no water or water rights are to be conveyed by the sellers to the buyers, but the sellers will furnish water when available at the rate of One Dollar ($1.00) per family unit and

the arrangement as to water to continue until such time as buyers can secure water from Douty water right.''

Concurrently with the signing of that document, the plaintiffs paid the defendants $1,000.00 of the purchase price of Happy Landing. It will be observed from the instrument just quoted that it was contemplated that the parties should meet again within sixty days and that upon that occasion the plaintiffs should pay the defendants $1,750.00 of the purchase money. The meeting occurred June 14, 1943, and in its course the plaintiffs made the required payment, signed a note and mortgage for the unpaid balance and received a deed for the Happy Landing tract. Likewise, on June 14 the parties signed the second paper which we have mentioned, that is, the one which is entitled Lease. It let the larger tract to the plaintiffs and gave them an option to purchase it for the sum of $2,000.00. Its provision in regard to the water right will receive mention in later parts of this opinion.

We shall now consider the first two assignments of error. We think that a consideration of them will be facilitated by an analysis of the parts of the complaint which set forth the averments concerning fraud and the purported defect in the two aforementioned agreements.

The complaint alleges that while the plaintiffs were negotiating with the defendants for the purchase of their property they told the defendants that

''the tract would have to have an ample supply of fresh water and under no circumstances would they consider the purchase of said tract of land unless there was an ample supply of fresh and pure water for the operation of such business available for use thereon.''

Further, according to the complaint:

> "Defendants thereupon stated and represented to plaintiffs that while there was a water supply on the premises now, no water right would be sold and conveyed with said tract of land and that there was none to be had or secured in connection therewith, and thereupon further stated and represented to plaintiffs that they were the owners of a certain other tract of unimproved land adjoining the above described land to which there was attached and belonged a water right, and which land and water right defendants owned and would sell to plaintiffs for the sum of $2,000.00, and which water right, if purchased by plaintiffs could be used in connection with the business which defendants were now operating on the improved tract hereinabove first described. That said defendants further stated and represented to plaintiffs that they would not sell said water right nor any interest therein, unless the said unimproved land was included in the sale; * * * ."

We think it is evident that the first tract which is mentioned in the quoted language is the one known as Happy Landing, and that the other one which the quoted language says was unimproved and possessed of a water right was the ten-acre parcel.

So far, the complaint has spoken of a water supply and a water right, but has not particularized. We now come to a paragraph of the complaint, being paragraph IV, wherein the plaintiffs set forth the precise representations which they attribute to the defendants concerning water. From it we can determine the character of the right which the parties had in mind. We quote:

> "That said last described tract of land so displayed by defendants was and is marsh and tide land and useless for any practical or beneficial

purpose and without market or other value beyond a nominal sum. Defendants further stated and represented to plaintiff at said time that the value of said land was in the water right and that said water right was a particularly valuable water right; that the said water right was a right in the water system which supplied a large mill nearby and some residences, which mill was temporarily closed down and would reopen in two or three days. That a 'T' connection had been specially placed in the pipe line running from the reservoir of said water system to the mill for the specific purpose of delivery of the water, under said water right, to the said unimproved ten acre tract last above described; and that by purchase of the said tract and water right plaintiffs would acquire title to a water right by which they would be permanently assured of ¾ of an inch of water, of an ample supply of fresh and free water for the businesses and purposes contemplated by plaintiffs as aforesaid, and for both of said tracts of land above described. And defendants pointed out to plaintiffs a spot on the unimproved tract of land and stated and represented that said 'T' connection was in the said water pipe line at that point; and that if plaintiffs purchased said water right they could take delivery of the water under said right merely by connecting their pipe line to such ¾ inch 'T' connection.''

The complaint avers that the plaintiffs accepted as true the representations just mentioned and thereupon expressed a willingness to enter into an agreement whereby (1) they would purchase the Happy Landing tract, and (2) have a lease-option covering the larger tract and its water right. Those averments are followed by others, which say:

''Whereupon said defendants caused a memorandum agreement in writing to be prepared, setting out the terms and conditions of the agreements which had been arrived at between the parties

and caused to be inserted in said memorandum agreement the following paragraph, to-wit:

" 'It is agreed between the parties hereto that if the option to purchase an unimproved portion of property is exercised there shall be conveyed with said property seller's interest in a water right known as the "Douty Water Right".' "

Continuing, the complaint alleges that when the defendants presented the memorandum to the plaintiffs for signature, the defendants repeated all of the aforementioned purported representations

"and represented to these plaintiffs that the descriptive expression 'Douty Water Right' was the identical water right which they had theretofore described to these plaintiffs and represented to be a water right attached and belonged to the said 10 acre tract, and was a right assuring them of the permanent right to ¾ of an inch of water delivered at the 'T' connection theretofore pointed out to plaintiffs by defendants, as aforesaid."

The complaint alleges that at that juncture the plaintiffs signed the memorandum agreement and:

"At the time of the execution of the said agreement the plaintiffs and defendants mutually understood and interpreted the said contract as relating to and being a contract for the sale, lease and purchase of the two tracts of land hereinabove described, together with a water right of the kind and nature described and represented by defendants to plaintiffs aforesaid."

It is in the manner just described that the complaint claims that the plaintiffs were induced to sign the memorandum agreement. After the pleading has made the above charges, it moves ahead to the middle of June, 1943; that is, to the occasion when the plaintiffs accepted the deed to Happy Landing and signed the

necessary note and mortgage covering the balance of the purchase money. We quote again from the complaint:

"That said defendants thereupon, on or about the 15th day of June, 1943, presented to the plaintiffs a form of lease and option agreement, which they stated and represented had been prepared in accordance and in conformity with the provisions of the above-mentioned memorandum agreement set out herein as 'Exhibit A'."

Thus, the averment says that on June 15 the defendants presented to the plaintiffs for signature the lease option agreement and in so doing represented that the paper conformed to the provisions of the memorandum agreement. A copy of the lease option agreement is attached to the complaint. It describes the ten-acre tract, and its pertinent parts are:

"TO HAVE AND TO HOLD said premises for a period of one year and six months from the date hereof, at and for the agreed rental at the rate of One Hundred Dollars ($100.00) per year, payable in advance, receipt of $100.00 as first year's rental being hereby acknowledged by the lessors. * * *

"That as a part of the consideration for this lease, the grantors, their heirs and assigns, give and grant unto the lessees at any time during the period limited by this lease, to purchase the real property hereinabove described together with all of the right, title and interest of grantors in and to water and water rights known as International Pacific Pulp & Paper Company Water Right derived through grantors application to State of Oregon No. 14453 and permit No. 10473 at and for the agreed purchase price of Two Thousand Dollars ($2,000.00).

"It is mutually agreed by and between the parties hereto that in case lessees exercise this option to buy said real property and water right,

then and in that case all rent paid by the lessees to the lessors shall be applied upon the purchase price and the balance of said purchase price paid by the lessees to the lessors, their heirs or assigns, at the rate of One Hundred Dollars ($100.00) per month including interest at the rate of 6% per annum, lessors to convey valid, merchantable title to said real property free and clear of incumbrances, including taxes to date of sale.''

The pleading avers that when the defendants presented to the plaintiffs for their signature the lease-option they ''represented to these plaintiffs that the language 'together with all of the right, title and interest of grantors in and to the water and water rights, known as International Pacific Pulp & Paper Company rights derived through grantor's application to the State of Oregon No. 14453 and permit No. 10473, and for the agreed purchase price of $2,000.00' was a more complete, clear and accurate description of the water right as described and represented to plaintiffs by defendants, and did describe an actual water right owned by defendants of the nature and character represented by them to plaintiffs as aforesaid.'' Relying upon those representations, so the complaint says, the plaintiffs signed the paper. ''At the time of the execution of the said agreement,'' according to the complaint, ''these plaintiffs and said defendants mutually agreed and defendants represented that the water right intended to be conveyed was of the quantity, character and nature theretofore described by defendants to plaintiffs.''

The complaint states that in August, 1944, the plaintiffs exercised the option given to them by the lease option, tendered to the defendants all the moneys payable to them, and demanded that the defendants

deliver to them the proper title instruments "conveying to the plaintiffs the title to said unimproved tract of land and said water right." October 9, 1944, the defendants, according to the complaint, tendered a deed

> "in purported compliance with the terms of said contract, but which said deed does not convey or purport to convey a water right or any right to water, and contains the following expressed exception to the warranty in said deed, to-wit: 'except the water rights in this deed mentioned and referred to and known as the International Pacific Pulp & Paper Company water right as a conveyance of said water right, is only by way of quit claim and not by warranty.'"

The pleading avers that the deed did not meet the demands of the contract in that

> "At all times prior thereto said defendants and these plaintiffs had construed and interpreted said contract and its covenant to sell to plaintiffs the water right therein described as being an agreement to sell a water right appurtenant to and a part of the said unimproved 10 acre tract, by which said land was entitled to ¾ of an inch of water delivered at the 'T' connection on the land at the place pointed out by said defendants as aforesaid."

The defendants' representations, so the complaint avers, were false in the following particulars:

> " * * * the said defendants did not have or own any water right or interest in a water right known as the Douty Water Right or as the International Pacific Pulp & Paper Company water right; that in fact the said water right specifically mentioned by number in said agreement as secured under application No. 14453 and permit No. 10473, had been cancelled in 1934 by the State of Oregon, pursuant to request for such cancellation by the defendants.

That the said defendants well knew these facts and well knew at the time that the mill which they said was temporarily closed was permanently closed, and was about to be dismantled; that there were no water right attached or appurtenant, and as part of the said unimproved 10 acre tract of land, above described.''

It is alleged that the two tracts without a water right are valueless. We again quote:

''Said contracts and each thereof should be reformed by inserting in lieu of the false and fraudulent description and reference to a non-existing water right the true understanding and agreement of defendants to sell and of plaintiffs to purchase a water right to ¾ inch of water appurtenant to and a part of said land delivered at a 'T' connection adjacent thereto.''

The answer denied all averments of fraud and mistake.

■ It may be well at this point to go back over the quoted parts of the complaint and determine from them the precise kind of water supply or water right concerning which the plaintiffs claim the parties bargained. The terms ''water supply'' and ''water right'' generally do not have the same connotation; nevertheless, parties may use them synonymously if they care to do so. The former is a part of the layman's vocabulary, while the latter is making its way into the law books as a term of art. Generally, the term ''water right'' means a right to divert water by artificial means from a natural stream or a spring. The complaint does not indicate that the parties were concerned with that kind of a right. At any rate, it mentions no stream or spring. It avers that at the inception of the negotiations the plaintiffs told the defendants that the tract, in order to be of interest to them, ''would have

to have an ample supply of fresh water'' and that they would not consider its purchase unless it possessed ''an ample supply of fresh and pure water.'' Those averments speak of a supply of water, not a water right. We shall now return to paragraph IV of the complaint. It appears to be definitive concerning the character of the right pertaining to water which the plaintiffs claim was promised to them. That paragraph, referring to representations which the plaintiffs attribute to the defendants, says: ''The said water right was a right in the water system which supplied a large mill nearby and some residences.'' If we understand correctly the meaning of the words just quoted, it is that the defendants represented that the water right which they possessed was a right in a water supply system. Such a representation seemingly could not have been understood as one that the defendants had a right to divert water from a stream. Continuing, the quotation says that the defendants represented to the plaintiffs, not only that they had ''a right in the water system which supplied a large mill,'' but also that ''a 'T' connection had been specially placed in the pipe line running from the reservoir of said water system to the mill.'' Thus, the plaintiffs swear that the defendants represented that their right authorized them to divert water, not from a stream or a spring, but from a pipe which constituted a part of a water system. The quoted language also says that the tee, according to the defendants' representations, was placed in the pipe ''for the specific purpose of delivery of the water, under said water right, to the said unimproved ten-acre tract last above described.'' From the foregoing, we assume that the pipe in which the tee had been placed was part of a water system which served a mill and some residences.

Additional language, which we quoted from the complaint, alleges:

> "By purchase of the said tract and water right plaintiffs would acquire title to a water right by which they would be permanently assured of ¾ of an inch of water."

Rendering it still more clear that the plaintiffs did not understand that they were to have a right to divert water from a stream, but only from a pipe, we have the following, already quoted from their complaint:

> "Defendants pointed out to plaintiffs a spot on the unimproved tract of land and stated and represented that said 'T' connection was in the said water pipe line at that point; and that if plaintiffs purchased said water right they could take delivery of the water under said right merely by connecting their pipe line to such ¾ inch 'T' connection."

It is true that other averments of the complaint refer to the Douty water right, to the International Pacific Pulp & Paper Company right and to rights derived through an application which bore No. 14453 and which was secured under a permit bearing No. 10473. But all of that identifying data, according to the complaint, was employed only for the purpose of assuring the plaintiffs that they would receive the water right which the defendants previously had described to them; that is, the right to connect at a tee with a pipe which ran from a reservoir to a mill. That we have correctly discerned the nature of the right which the defendants' purported representations portrayed is indicated by the following excerpt, which we take from the plaintiffs' brief:

> "That the respondents represented to the plaintiffs that there was a large pipe running from a large reservoir situated on the hill to the mill

property and a three-quarter inch tee had been inserted in said pipe on the mill property to which the respondents had the right to attach at any time a pipe which would furnish a permanent supply of free and pure water in abundance for the improved as well as for the unimproved tract.''

From all of the foregoing, we conclude that the defendants' representations, if the complaint correctly states them, were that the defendants possessed a right to connect a ¾-inch pipe with a main that ran from a reservoir to a mill and thereby obtain water for use upon the ten-acre tract. The representations included the particular that a tee had been installed in the main for the defendants' convenience. There was no representation that the defendants owned the water supply system, nor that the entire system would be conveyed to the plaintiffs if they purchased the ten-acre tract. The construction of the pleading last stated is certainly warranted by another averment of the complaint, which says:

"Defendants and these plaintiffs had construed and interpreted said contract * * * as being an agreement * * * by which said land was entitled to ¾ of an inch of water delivered at the 'T' connection ''

Further, it is clear that the plaintiffs do not claim that the defendants represented that a pipe had already been laid from the tee to the ten-acre tract.

It is evident that if the defendants possessed the right indicated in the preceding paragraph and were able and willing to transfer it to the plaintiffs, the attacked decree is free from error.

Before taking notice of the evidence which indicates whether or not the defendants had the right to divert water from a pipe which ran from a reservoir to a mill

at a place where a tee had been installed, we shall first consider the evidence which shows the circumstances under which the plaintiffs signed the two instruments under attack. Both instruments were prepared by Mr. L. G. English, an attorney who practices his profession in Toledo. The uncontradicted evidence shows that Mr. English represented not only the defendants but also the plaintiffs in the preparation of the instruments. It also shows that he represented both parties fairly, impartially and honorably. No one questions his word, motives or high purposes.

Prior to April, 1943, the plaintiffs, who resided in Los Angeles, wrote to the defendants a letter of inquiry concerning the property known as Happy Landing. The defendants replied that the property was about ten acres in extent, and said:

> "After you see the property and you should want it all, the price would be $7,500. * * * We might suggest you could buy the business property at $5,500 to start with, and we could give first option on the improved, if it would make it any easier to handle. * * * You had better take a run and look us over. We think we have a pretty nice location and price is right. We can then sit down with a couple of sticks and go to whittling."

April 15, 1943, the plaintiffs came to the defendants' property and were given the occupany of one of the Happy Landing cabins. They stayed at Happy Landing four days before the transaction in question occurred. There is no claim that the defendants withheld any requested information or concealed anything from the plaintiffs. Referring to the property, Mrs. Boyce, one of the plaintiffs, swore: "We looked it over, looked it over to our own satisfaction." Her husband gave similar testimony. After the plaintiffs had talked

matters over with the defendants they decided on April 19 to purchase the smaller tract, that is, Happy Landing. The parties agreed that the purchase price should be $5,500 and that the plaintiffs should rent the larger tract at an annual rental of $100.00. It was also agreed that the plaintiffs should have an option to purchase the larger tract for the price of $2,000.00.

April 19 the plaintiffs and the defendants went to the office of Mr. English. They instructed him to prepare whatever papers were necessary to carry into effect the agreement which they had effected. The four fully related to him the agreement. Then all left Mr. English's office while he prepared the paper. Later in the day the four returned to Mr. English's office and there "Mr. English read it all over to us before we signed it." The words just quoted were taken from Mrs. Boyce's testimony. Each was given an opportunity to read the paper. No one claims that the opportunity to familiarize himself with the paper was inadequate. When all had expressed satisfaction with the paper, Mr. English had each sign it. A previous paragraph of this opinion copies the paper. It is the Memorandum Agreement. Concurrently with the signing of the paper, the plaintiffs paid the defendants the required sum of money and then the two couples returned to Happy Landing. The next day the plaintiffs began their return to Los Angeles. They wished to sell their home in that city before moving to Happy Landing.

The memorandum agreement, that is, the one which we just described, contemplates that other documents should be prepared after the two tracts had been surveyed. April 24, Mr. English completed the preparation of the additional instruments and mailed them

to the plaintiffs. They included, besides a note, mortgage and deed, the other agreement to which we have referred; that is, the lease-option. A preceding paragraph quotes the material parts of it. The plaintiffs admit that they received all of those papers including the lease-option, and that while they were in Los Angeles they read them. If they experienced any difficulty in understanding what they read, they made no mention of it while they were on the witness stand.

June 8, 1943, the plaintiffs returned to the Happy Landing tract and resumed occupancy of one of the cabins. They brought with them the papers which they had received from Mr. English, and on June 14 told the defendants that they would like to complete the transaction. In the meantime, they had expressed no dissatisfaction whatever with any of the instruments nor with their transactions with the defendants. In the morning on the 14th Mr. Boyce, one of the two plaintiffs, signed all of the papers which called for his signature, and then his wife and the defendants repaired to Mr. English's office. There is no claim that while the three were in the attorney's office Mrs. Boyce expressed any displeasure with any part of the transaction concerning the two tracts of land. To the contrary, she and the defendants signed all of the papers and Mrs. Boyce paid the defendants the part of the purchase money which was then payable. Mr. English's unchallenged testimony indicates that the signing and the paying of the money "was not a hurried transaction."

Without going further into this phase of the case, we state that the evidence shows that the averments of the complaint are untrue which allege that it was the defendants who caused to be drafted the two papers

known as the memorandum agreement and the lease-option. The truth is that an attorney who represented both the plaintiffs and the defendants prepared those documents. His fairness and his fidelity to all of his clients is questioned by no one. He represented neither party in the circuit court and appears for no one upon this appeal.

Unchallenged evidence indicates that the reservoir, which is mentioned in the quotations we took from the complaint, exists and that a pipe leads from it to the mill of the International Pacific Pulp & Paper Company. The plaintiff, B. I. Boyce, testified that the pipe runs "approximately 100 to 125 feet" from his house. Other unchallenged evidence indicates that the pipe, in addition to bringing water to the mill, serves twelve to fifteen dwelling houses in Kernville. Each user of water pays $1.00 for each tap in his house.

The plaintiff, B. I. Boyce testified:

"Q. Will you just tell us exactly what the Killips told you, or represented to you in respect to that water right?

"A. They said that by purchasing the unimproved property that we would receive a water right.

"Q. Is that all they said?

"The Court: They pointed out to you where the water was coming from, didn't they?

"A. Yes, they said it was coming from the hillside.

"Mr. Schwabe: They pointed to the hillside and they meant that was your source of water?

"A. I imagine.

"Q. And they told you that if you bought that ten acres you would have a right to connect on to a three quarter inch tee, is that correct?

"A. That would be our water right."

    *    *    *

"Q. Did you go up and look at the source?

"A. I did not.

"Q. Did you ask them to show you the source?

"A. Not necessarily.

"Q. Did you or didn't you?

"A. No. I took their word for it.

\* \* \*

"Mr. Schwabe: You were in the court room when your wife testified that the Killips on several occasions came over and offered to show you where that tee was, and that you were always too busy to go over? You heard your wife testify to that?

"A. I heard her testify to that, yes, sir.

"Q. Was that the truth?

"A. That was possibly the way she saw it.

"Q. Well, how did you see it?

"A. One day Mr. Killip and I were talking out in the middle of the parking lot at Happy Landing. It was during our busy season down there, the first year, and I had spoke to him before this time that I would like to know where this attachment was, so this day there was something said about it, and he said 'I will show it to you.'

"Q. When was this?

"A. The first summer, 1943, but before we got a chance to see where it was I was called down on the dock. They wanted something to do about the business, and there was never anything more said about it.

"Q. In other words, do I understand, then, that you differ with your wife on her statement that the Killips on several occasions asked you to come over and see it?

"A. They may have talked to her on any number of occasions.

"Q. As far as you are concerned it was only once?

"A. That one time in particular that I remember.

"Q. There may have been other times?

"A. There might have been other times.

"Q. Did you ever at any time when you were not busy ask Doctor or Mrs. Killip to show you where the tee was?

"A. That was the only—there was nothing said about it after that."

The plaintiff, Mrs. Boyce, referring to the defendants, testified:

"They offered to take us down and show it to us at various times, this T, but it was at times that we both were very busy and couldn't get away.

\* \* \*

"Q. Now you testified that they told you that they had a right to hook on to this water system that had been put in in connection with the operation of that mill, didn't they?

"A. They told us there was a T in that pipe line from the reservoir to the mill and we were supposed —there was where we were to hook on.

"Q. Then they told you what you had was a right to hook on to that water main, is that right?

"A. That was where we were to run our supply of water that would be given to us by our water right, that we would get when we bought this unimproved ten acres.

"Q. All right. You would get a right to hook on to a water pipe?

"A. We would get a right to hook on to that water pipe to get this water provided for us by the water right.

"Q. Exactly. That's exactly right."

The foregoing certainly warrants a conclusion that Dr. Killip several times offered to take the plaintiffs to the pipe line which ran from the reservoir to the mill and show them the tee, but that the plaintiffs never availed themselves of his offer. The following

averment of the complaint, previously quoted, is untrue: ''Defendants pointed out to plaintiffs a spot on the unimproved tract of land and stated and represented that said 'T' connection was in the said water pipe line at that point.'' That statement is untrue only because the plaintiffs failed to accept Dr. Killip's repeated invitation to accompany him to the place where the tee had been installed.

Following delivery to them of the deed to the Happy Landing tract on June 4, 1943, the plaintiffs operated that resort. August 9, 1944, they wrote to the defendants that they were prepared to discharge the mortgage which encumbered the Happy Landing tract and to exercise the option which entitled them to purchase the larger tract. The letter said:

> ''It is understood, of course, that the said deed to the ten (10) acres° of unimproved land shall contain such covenants and agreements as are contained in the original memorandum agreement dated 19th day of April, 1943, and the lease option dated in May, 1943. * * * The abstract discloses the fact that the property specified as above appears to be subject to a lease with the Lincoln County Logging Company. This lease will have to be satisfied of record.''

Apart from the objection mentioned in the last sentence of the quotation, the plaintiffs manifested no dissatisfaction with their transaction with the defendants, nor with any of the instruments which the parties had signed. That defect has been eliminated and is no feature of this appeal. The memorandum agreement, it will be remembered, stated that if the option was exercised ''there shall be conveyed with said property seller's interest in water right known as Douty water right.'' The lease-option, after referring to the larger

tract, said: " * * * together with all of the right, title and interest of grantors in and to water and water rights known as International Pacific Pulp & Paper Company right derived through grantors' application to State of Oregon No. 14453 and Permit No. 10473." Neither of those instruments contemplated that the transfer of the water right should be accompanied with warranties.

Following their receipt of the letter of August 9, 1944, the defendants tendered to the plaintiffs all of the needed title instruments, including a deed to the larger tract, which contained the following provision concerning the water right:

"And said grantors do further quit-claim, give and grant unto the vendees herein all the right, title and interest of the grantors in and to the water rights known as International Pacific Pulp & Paper Company water rights derived through grantors' application to the State of Oregon No. 14453 and Permit 10473, said water rights being more particularly described in Paragraph 5 of the agreement entered into on the 29th day of May, 1933, between J. J. Killip and Anna Louise Killip and the International Pacific Pulp & Paper Company, an Oregon corporation, which said agreement was recorded on the 13th day of April, 1936, and recorded in Book 72, page 111, Record of Deeds of Lincoln County, Oregon, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining, and also all their estate, right, title and interest in and to the same, including dower and claim of dower.

"To have and to hold, the above described and granted premises unto the said Brewster I. Boyce and Sudie E. Boyce, their heirs and assigns forever. And J. J. Killip and Anna Louise Killip, grantors above named, do covenant to and with Brewster

I. Boyce and Sudie E. Boyce, the above named grantees, their heirs and assigns that they are lawfully seized in fee simple of the above granted premises, that the above granted premises are free from all encumbrances, and that they will and their heirs, executors and administrators, shall warrant and forever defend the above granted premises, and every part and parcel thereof, against the lawful claims and demands of all persons whomsoever, except the said water and water rights in the deed mentioned and referred to and known as the International Pacific Pulp & Paper Company water right, as a conveyance of such water right is only by way of quitclaim and not by warranty.''

The plaintiffs refused to accept the deed. The following taken from their brief, states their reasons:

''About this time the appellants discovered that the water right and permit referred to in the lease had been cancelled by the respondents on the 15th day of December, 1934, whereupon the appellants notified the respondents that they would exercise the option to purchase the unimproved tract and the water rights mentioned in said exhibits 'A' and 'B' and demanded a warranty deed therefor and also notified the respondents they would pay off the balance of the mortgage. * * *

''The deed deposited * * * was not in accordance with the representations of the respondents and the agreement of the parties (see Plaintiffs' Exhibit 'E') in that the deed only quit-claimed to the appellants such 'right, title and interest of the grantors in and to the water rights' and excepted from the general warranty 'the said water and water rights in this deed mentioned and referred to and known as the International Pacific Pulp & Paper Co. water rights as a conveyance of such water rights is only by quit-claim and not by warranty.'

* * *

"The facts are uncontroverted that the respondents did not own or possess any water rights in and to the said mill which they could convey or even assign. The respondents' water rights had been surrendered and cancelled approximately nine years before. At the time of the negotiations and transactions of the parties the mill had closed down and any water right it may have had from any party had reverted."

Uncontradicted evidence shows that in the latter part of 1931 the defendants purchased sixteen acres of land in Lincoln County which included the two parcels with which this suit is concerned. Prior to making the purchase Dr. J. J. Killip, who is one of the two defendants, was a practicing dentist. The loss of his eyesight forced him to abandon his profession and seek another vocation. Dr. Killip and his wife, the other defendant, planned to develop the sixteen-acre tract into a large resort. Such being their plan, they sought a water supply. December 30, 1931, Dr. Killip filed with the State Engineer an application to divert water from a stream near the tract. The application bore No. 14453 and identified the stream as "unnamed creek, a tributary of Siletz Bay." The application was approved by the engineer and there was issued to Dr. Killip permit No. 10473. At about the same time Ammon N. Bones and Julia A. Bones, husband and wife, who owned five acres in the immediate vicinity of the defendants' property, filed application No. 14719 with the State Engineer to divert water from the same stream which was named in the defendants' application. Their application was allowed through the issuance to them of permit No. 10846. It is not claimed that there was any conflict between the Bones and the Killip permits. We omit mention of the quantities of

water specified in the permits because that detail is immaterial.

In 1932 Mr. F. A. Douty, who is mentioned in some of the documents to which we have referred, on behalf of the corporation of which he was president, International Pacific Pulp & Paper Company, negotiated with the defendants for the purchase of 4½ acres of their land. The corporation wished to construct a mill upon the tract. It sought not only the purchase of the 4½ acres, but also the acquisition of the defendants' water right. About the same time the International Pacific Pulp & Paper Company was negotiating with the Boneses for the purchase of their water right.

May 29, 1933, the corporation and the defendants signed an agreement wherein (1) the corporation agreed to purchase the 4½-acre tract for the sum of $1,250.00, in addition to the other consideration which we shall presently mention; and (2) the defendants' agreed to convey to the corporation the 4½-acre tract and to grant to the corporation the following rights:

"The vendors have made application to appropriate a portion of water from an unnamed creek, a tributary of Siletz Bay, * * * the vendors' application bears application number 14453 and permit number 10473, which application for permit shows that the use to which the water is to be applied is domestic supply and to operate a hydraulic ram, and the vendors hereby give the purchaser the right to construct at purchaser's own cost and expense such dams and install such pipes and equipment on said creek as the vendors' rights' may legally permit under said application. Provided, however; that the purchaser shall also at its own cost and expense place in such pipe-line a connecting iron tee of not less than three-fourths

inch size and permit the vendors to connect therewith; the connection made by the vendors shall be at vendors' cost and expense. And, provided, further, that the vendors cannot at any time use more of the water passing through the mains of the purchaser than the quantity covered by said permit, however, the vendors, their heirs and assigns, shall have the use of such water granted in said permit without any charge therefor from the purchaser. And it is further understood and agreed that if the giving of these rights by the vendors are permissible, then the purchaser agrees to construct such dams and complete such pipe-line by the 1 day of March, 1934. Said purchaser shall at its own cost and expense procure such rights-of-way as are necessary in the construction of said dam or dams and the laying of said pipe-line. And it is further understood and agreed that in the event that the purchaser shall fail to construct such dam upon said creek and to complete such pipe-line in order that the water may be applied to the proposed use in accordance with said permit by the 1 day of March, 1934, then it is also understood that the agreement with reference to said water permit shall be null and void and the vendors shall then be free to proceed under said application and to construct their own dam and lay their own pipe-line free from any right or claim of the purchaser. It is understood and agreed that the failure of any right herein given with reference to said water permit shall not relieve the purchaser from the full payment of the purchase price herein specified for the real property herein to be conveyed.''

That instrument was recorded in the deed records, April 13, 1936. It will be observed that it bound the International Pacific Pulp & Paper Company to install in its mains a ¾-inch tee and permit the defendants to attach there a pipe so that they could secure from the main a supply of water. The instrument provides

that the defendants may have the water "without any charge therefor from the purchaser" and it also provides that the defendants, "their heirs and assigns, shall have the use of such water." Further parts of the agreement contemplate that the company should install a water supply system including such features as a dam and a pipe line. We shall presently see that the company entered into an agreement with the aforementioned Mr. and Mrs. Bones concerning construction work. Dr. Killip swore that concurrently with the execution of the agreement of May 29, 1933, by the International Company and the defendants, the latter assigned to the company the rights conferred upon them by their water permit.

August 15, 1933, Mr. and Mrs. Bones, whom we have mentioned, through the medium of a written document which recited their receipt of a valuable consideration, assigned to the International Pacific Pulp & Paper Company all of their interest "in and to certain waters acquired through application No. 14719, permit No. 10846, issued by the State Engineer * * * ." Through the medium of another document entitled Permanent Land Lease which the Boneses executed August 15, 1933, they "hereby exclusively and permanently license and permit the said International Pacific Pulp & Paper Company to lay down, construct, and perpetually maintain a private water cistern and pumping station with water pipe and electric lines as hereinafter described * * * ." The document described the Bones five-acre tract, a dam, pumps, electric cables, and so forth. The document authorized the International Pacific Pulp & Paper Company to enter perpetually upon the Bones property

"for the purpose of construction, installation, repairs, service, transmittal of necessary equipment

and materials, and operation of the water system to be installed, and hereby further grant to the International Pacific Pulp & Paper Company the right to at any time dismantle and remove at its own cost and expense from said described land all or any portion of such equipment and material as they may hereafter install thereon, and thereby cancel this lease and discontinue the water service provided herein; providing, however, that any and all State Water rights that may have been assigned to Ammon N. and Julia A. Bones to the International Pacific Pulp & Paper Company in connection with this Agreement, shall upon International Pacific Pulp & Paper Company electing to dismantle and remove said equipment, reassign such water rights to them.''

The record indicates that February 27, 1934, the State Engineer, pursuant to applications made by the International Pacific Pulp & Paper Company, issued to it two permits which authorized it to divert water from the stream which is named in the permits previously issued to the defendants and to the Boneses.

Dr. Killip testified that December 15, 1934, he authorized the State Engineer to cancel the permit which had previously been issued to him. Dr. Killip swore that he could not recall clearly the reasons which prompted him to take that course, but it will be observed that the attempted cancellation was not made until after the defendants had assigned their rights to the International Pacific Pulp & Paper Company. According to his recollection, Dr. Killip made the attempted cancellation during a visit in the office of the State Engineer in the course of which he was told that he had not completed his appropriation of water, and that the assignment of the rights manifested by his permit had not been recorded. Whatever may

be the explanation, the attempted cancellation was not made until after the defendants had transferred their rights.

The defendants did not attempt to run a pipe from the aforementioned tee to the ten-acre tract until the year 1945. At that time they encountered a rumor that the International Pacific Pulp & Paper Company was contemplating the sale of its water system, and, believing it advisable to lay the pipe so as to apprise everyone of the rights conferred by the contract of May 29, 1933, they made the connection at the tee and laid the pipe. A witness swore that on the same day he testified he saw the tee, examined the pipe and observed that it brought a flow of water to the ten-acre tract. The evidence indicates that the International Pacific Pulp & Paper Company has never questioned the validity of the contract which it and the defendants executed May 29, 1933.

By reverting to the document signed by the Boneses and the International Pacific Pulp & Paper Company August 15, 1933, it will be observed that the Boneses are authorized to terminate the relationship if the International Pacific Pulp & Paper Company elects to dismantle its water supply system. Although the record contains evidence indicating that in August, 1945, that concern gave indications of a purpose to discontinue its water service, there is no evidence that it had any such thought in 1943 when the plaintiffs and the defendants executed the instruments before us.

The facts reviewed in the preceding paragraphs indicate that the defendants possess a right which the International Pacific Pulp & Paper Company has never challenged, whereby the defendants are entitled to connect a ¾-inch pipe with that concern's main and

thereby obtain, without charge, for themselves and their assignees, a supply of water for the ten-acre tract.

It is true that the instrument which the plaintiffs and the defendants signed June 14, 1943, and which we have termed the lease-option, speaks of "all of the right, title and interest of grantors in and to water and water rights known as International Pacific Pulp & Paper Company water right derived through grantor's application to State of Oregon No. 14453 and Permit No. 10473." But the complaint, after having quoted those exact words, states that they were merely "a more complete, clear and accurate description of the water right as described and represented to plaintiffs by defendants."

■■ We deem it unnecessary to review once more the authorities which hold that a mere preponderance of the evidence does not suffice to establish a charge of fraud. Likewise, we think it unnecessary to review the numerous decisions which hold that one who seeks a reformation of an instrument faces a presumption that the latter correctly states the terms of the agreement.

■ So far, we have recounted only a small part of the evidence. The latter is extensive. The defendant, Anna Louise Killip, swore that at the inception of the transaction she fully explained to the plaintiffs that she and her husband had a contract with the International Pacific Pulp & Paper Company which entitled them to connect a ¾-inch pipe with the concern's main at a place where a tee had been installed and thereby run a supply of water to the ten-acre tract. She also swore that she showed the plaintiffs the written document conferring the right, being the paper described in a previous paragraph of this opinion.

The plaintiffs contradicted that testimony. There are other contradictions in the lengthy transcript of testimony, but they do not concern the nature of the right which the defendants' representations described. It appears to us that in all of their representations the defendants never claimed that they would transfer to the plaintiffs any right except one to make the connection which we have just mentioned. Moreover, the complaint itself, as we think we have shown by our analysis of it, indicates that the representations made by the defendants were that their water right consisted of a privilege of connecting a ¾-inch pipe to a main which ran from a reservoir to the mill. It was a right to a water supply as distinguished from a water right. We know of no occasion for making a further review of the evidence.

We are satisfied that the defendants had the right mentioned in their representations. We are also satisfied that when the plaintiffs announced their intention to exercise their option, the defendants tendered to them an appropriate instrument of conveyance. It follows from this that the charges of fraud were not proved, and that the instruments which the parties signed April 19, 1943 and June 14, 1943, correctly set forth the agreements.

The decree of the circuit court is affirmed.